**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY**

---

|  |  |  |
|---|---|---|
| | : | |
| B. JANET PETTI, | : | |
| | : | Civil Action No. 3:15-cv-7305-BRM-DEA |
| Plaintiff, | : | |
| | : | |
| v. | : | |
| | : | |
| | : | **OPINION** |
| OCEAN COUNTY HEALTH | : | |
| DEPARTMENT (improperly pled as | : | |
| OCEAN COUNTY BOARD OF | : | |
| HEALTH), | : | |
| | : | |
| Defendant. | : | |
| | : | |

---

**MARTINOTTI, DISTRICT JUDGE**

Before this Court is Defendant Ocean County Board of Health Department's ("Ocean County" or "Defendant") Motion for Summary Judgment (ECF No. 61), Plaintiff B. Janet Petti's ("Petti" or "Plaintiff") Motion to Strike Ocean County's Motion for Summary Judgment (ECF No. 75), and Petti's Motion for Emergency Relief. (ECF No. 83). Petti filed an Opposition to Ocean County's Motion for Summary Judgment (ECF No. 76) and Ocean County filed an Opposition to Petti's Motion to Strike (ECF No. 77) and a Reply Brief to Petti's Opposition to its Summary Judgment Motion. (ECF No. 80). Additionally, Ocean County filed an Opposition to Petti's Motion for Emergency Relief. (ECF No. 84.) Having reviewed the submissions filed in connection with the motions and having declined to hold oral argument pursuant to Federal Rule of Civil Procedure 78(b), for the reasons set forth below and for good cause shown, Ocean County's Motion for Summary Judgment is **GRANTED** and Petti's Motion to Strike Ocean

County's Summary Judgment Motion and Motion for Emergency Relief are **DENIED AS MOOT**.

## I.   PROCEDURAL HISTORY

On October 2, 2015, Petti filed a Complaint (the "Complaint") against Ocean County before this Court. (ECF No. 1.) On March 22, 2016, Petti filed an Amended Complaint (the "Amended Complaint"), asserting causes of action for violations of the Americans with Disabilities Act ("ADA") (Count One), violations of Title VII of the Civil Rights Act (Count Two), and wrongful termination (Count Three). (ECF No. 3.) On May 5, 2016, Ocean County filed its Answer (the "Answer") to Petti's Amended Complaint. (ECF No. 10.)

On July 26, 2018, after the close of discovery, Ocean County filed a Motion for Summary Judgment. (ECF No. 61.) On September 6, 2018, Petti filed a Motion to Strike Ocean County's Motion for Summary Judgment, asserting that Ocean County's moving papers failed to comply with Local Civil Rule 56.1. (ECF No. 75.)[1] On September 11, 2018, Petti filed an Opposition to Ocean County's Motion for Summary Judgment. (ECF No. 76.) On October 12, 2018, Ocean County filed a Reply Brief to Petti's Opposition to its Motion for Summary Judgment. (ECF No. 80.)

On February 11, 2019, Petti filed a Motion for Emergency Relief and for an Order granting leave to file additional motions. (ECF No. 83.) On March 1, 2019, Ocean County filed an Opposition to Petti's Motion for Emergency Relief (ECF No. 84), and on March 8, 2019, Petti

---

[1] Specifically, Petti argues Ocean County's Summary Judgment Motion fails to comply with Local Civil Rule 56.1 as Ocean County did not submit its statement of material facts as a separate document from its Motion for Summary Judgment. (ECF No. 75 at 4-8.) On August 29, 2018, counsel for Ocean County submitted a letter acknowledging their error in failing to separate the statement of material facts from its legal argument and inquiring as to whether the Court would prefer that the motion be re-filed. (ECF No. 72.) On September 5, 2018, this Court issued an Order ruling that Ocean County need not re-file its motion. (ECF No. 74.)

filed a Reply Brief to Ocean County's Opposition to her Motion for Emergency Relief. (ECF No. 85).

## II. FACTUAL BACKGROUND

On October 21, 2004, Ocean County hired Petti as a full-time accountant in its Financial Control Department. (ECF No. 61-4, Ex. B.) Upon her employment at Ocean County, Petti received Ocean County's "Employee Handbook for Staff Personnel," which included Ocean County's policies on attendance, tardiness, and discipline. (ECF No. 61-4, Ex. D.) Petti also received a copy of Ocean County's Anti-Harassment Handbook, which contained information on how to properly file formal complaints. (ECF No. 61-4, Ex. E.) Ocean County also provided Petti with its Family and Medical Leave of Absence Policy ("FMLA"), indicating that an employee's failure to return after medical leave ends can result in discharge. (ECF No. 61-4, Ex. F.)

In November 2012, a construction and renovation project was commenced at Ocean County's main office, where Petti worked, located at 175 Sunset Avenue, Toms River, New Jersey (the "Toms River Office"). (ECF No. 61-5, Ex. I at 2.) The Toms River Office consists of two separate buildings, and the construction and renovation was planned in two separate phases, one building at a time. (*Id.*) On November 20, 2012, Petti sent an e-mail to Victoria Miragliotta ("Miragliotta"), Ocean County's Director of Administration and Program Development, inquiring as to the potential health effects of construction debris and the possibility it may aggravate her "medical condition." (ECF No. 61-5, Ex. K.) Specifically, Petti stated:

> I would like to know if any of the fibers from the insulation can infiltrate into the office where I work because this and any construction debris dust can aggravate my medical condition. Also I am concerned of asbestos which can harm the lungs. RTK would give me the right to inquire if this building has asbestos.

Does it?

I know when the Ac [sic] was on we could smell the odor of the smokers in the courtyard years ago. So I do not know if this is possible.

Thank you.

(*Id.*)

Notably, Petti's e-mail did not make any specific request for accommodations.

On November 26, 2012, following a string of e-mails between the two, Miragliotta informed Petti that she has "no documented medical condition on file" and that, therefore, her question was "unanswerable." (*Id.*) Petti responded that her "medical condition [is] HIPPA [sic] law protected" and that she was "merely asking a question that every individual has the right to ask (know)." (ECF No. 61-6, Ex. L.)

On November 28, 2012, Petti e-mailed Miragliotta and Daniel Regenye ("Regenye"), Ocean County's Public Health Coordinator, stating that she observed dust all over her window ledge and notebooks and requesting that the "safety of the work outside [her] window" be checked, further expressing her concerns about the possibility of an asbestos contamination. (ECF No. 61-6, Ex. M.) On November 29, 2012, Miragliotta sent Petti a report summarizing a sampling conducted by Remington, Vernick & Vena Engineers ("Remington") in March 2012 in which Remington tested building materials from the Toms River Office. (ECF No. 61-1, Ex. N.) The Remington report concluded the materials did not meet the Environmental Protection Agency's ("EPA") definition of "asbestos containing material." (*Id.*)[2]

_____

[2] Remington tested several different materials at the Toms River Office, including spray-on ceiling insulation, lay-in ceiling tile, white wall plaster, gray wall plaster, white floor tile, and mastic underlying the floor tile. (ECF No. 61-6, Ex. N at 16.) The study found no asbestos in any of the materials other than the white floor tile, but that the volume of asbestos in the tile was less

On November 29, 2012, Petti sent an e-mail to her direct supervisor, Mary McCarthy ("McCarthy"), Ocean County's Director of Finance, expressing concerns about the "hazards of the dust, debris, and the possibility of asbestos penetrating the building." (ECF No. 61-6, Ex. O.) She further informed McCarthy that she sent e-mails to Miragliotta and Regenye and claimed she had been given "no info about what [she] asked." (*Id.*) Petti claimed she did not feel comfortable due to the potential existence of asbestos as well as the "loud noise, the demolition, [and] the banging of big cement pieces." (*Id.*) McCarthy replied that she will "check with Environmental" but that she did not believe the building was infested with asbestos and would confer with the relevant data safety materials. (*Id.*)

On December 7, 2012, in apparent response to Petti's complaints, Regenye sent Petti a memo indicating that Ocean County was transferring her to its Lakewood facility, effective immediately. (ECF No. 61-6, Ex. P.) The memo advised that the location assignment was being done "to accommodate" Petti and further informed her that all work assignments would still flow from McCarthy. (*Id.*)

On December 27, 2012, McCarthy sent Petti an e-mail attaching a Loss Control Report conducted of the Toms River Office on December 11, 2012 (the "Loss Control Report") and informing her that she would be transferred back to the Toms River facility, effective January 2, 2013. (ECF No. 61-6, Ex. R.) The Loss Control Report was authored by Len Gatto ("Gatto"), the Senior Loss Control Consultant at J.A. Montgomery Risk Control ("J.A. Montgomery"), and concluded that the "renovation process appears to be well organized and free of recognizable hazards." (ECF No. 61-6, Ex. Q.) Furthermore, the Loss Control Report also found there was "no evidence of dust or construction residue on the walls or walking surfaces." (*Id.*)

---

than 1% and therefore did not qualify as an "asbestos containing material" pursuant to the EPA's guidelines. (*Id.*)

On January 2, 2013, Petti submitted a note from Dr. Praunsa Gourkanti, which stated, "Please excuse this patient 1/2/13 – 1/3/13, can go back to work 1/4/13." (ECF No. 61-6, Ex. S.) On the same date, Petti submitted a second note from Dr. Steven Ingato, which stated "due to pulmonary dysfunction, it is medically advisable that [Petti] avoid any exposure to dust, chemicals, construction materials, and other possible respiratory iritatns [sic]. Please contact our office if additional information is needed." (ECF No. 61-6, Ex. T.)[3] Presumably, Petti returned to work at Ocean County on January 4, 2013.

On January 7, 2013, Petti left work early. (Petti Dep. (ECF No. 61-4, Ex. H) at 142:19-143:13.) On the same date, Petti wrote a letter to McCarthy requesting reasonable accommodations, stating:

> I am requesting reasonable accommodations, which the ADA states if available; [sic] are to be made for me while the building located at 175 Sunset Ave, Toms River, NJ is under construction. I am requesting this until the building's construction is completed which I have been told will be December of 2013.

(ECF No. 61-7, Ex. W.)

Petti did not provide any supplemental information concerning the reasons for which she was requesting accommodations pursuant to the ADA.

Also on January 7, 2013, Miragliotta sent a letter to Petti confirming Ocean County had sent her two separate reports demonstrating that the Toms River building was safe from health hazards. (ECF No. 61-7, Ex. Y.) Specifically, the letter stated:

> It is my understanding that you left work early today. As you know, <u>we have given you two reports</u> from an outside safety consultant and a professional engineering firm indicating the facility is safe from construction residue, debris and all other

---

[3] On January 4, 2013, Petti also submitted a prescription from Coast Orthopedic Associates, stating "Central Jersey Hand . . . carpal tunnel syn left (lt)." (ECF No. 61-6, Ex. W.) It does not appear as though this submission is related to this litigation.

> concerns.
>
> Also, please be advised that the Ocean County Health Department offices at other locations currently have construction taking place as well. Therefore, the Toms River location is your reporting site as it has been checked by our consultants and is known to be safe and free of irritants and debris. Any additional absences will require use of benefit time.

(*Id.*)

Petti disputes Miragliotti's contention that Ocean County's other locations were also undergoing construction projects, arguing she was "physically at the Lakewood location from December 7, 2012 to Dec[ember] 31, 2012 and there was no construction nor any talk of construction." (ECF No. 76 ¶ 27.) In any event, Petti contends the construction at the Lakewood location was "not of the same magnitude" as that at the Toms River location. (*Id.*)

On January 9, 2013, Petti hand-delivered a letter to Regenye at the Toms River Office, again requesting accommodations due to the construction at that location and taking issue with the veracity of the reports tendered to her. (ECF No. 61-7, Ex. Z.)[4] Petti's January 9 letter stated:

> I have contacted [Miragliotta] on January 8 and 9, 2013 and asked to speak with you or make an appointment with you. I am delivering this letter by hand to request the above again.
>
> You made accommodations for my pulmonary disabilities on Dec[ember] 7, 2012 by moving me to the Lakewood office (after the duct tape on the windows had lost its adhesion) and now those accommodations have been taken away from me because it has been stated that "the Loss Control Report" states the Toms River building has no evidence of dust or any construction residue on the walls or walking surfaces. This report clearly in fine print states

---

[4] Also on January 9, 2013, Petti sent a letter to Claudia Lewandowski ("Lewandowski"), Ocean County's General Supervisor of Building Services, requesting an incident report of the "November 28, 2012 mishap of the silica/dust (from the breaking up of concrete cement boulders by your contractors) entering the closed window of the office that I share with other coworkers [at Ocean County's Toms River location]." (ECF No. 61-7, Ex. BB.) Ocean County did not respond to this letter as no report was generated pertaining to the incident alleged in Petti's letter. (*Id.*)

"there may be other conditions not examined or brought to the attention of the surveyors" such as the Nov 28th incident possibly. It states nothing about air quality or air quality tests had been performed.

I am concerned with the air quality after the Silica/dust entered my office through a closed window (possibly or the wall spaces) on Nov[ember] 28, 2012. Since August 16, 2012 I had requested an air quality test because of the AC vent problems and the ceiling tiles that are black near the air vents. This was requested of me to do by Dr. Detullio.

I have been under doctors care. I have submitted a note from my doctor, Dr. Ingato, stating that I should not be in this construction area because of pulmonary problems. After being in Toms River office January 7, 2013, I had an allergic reaction and I was prescribed medications from my doctor. I need your occupational doctors to attend to this.

I had written a letter asking for accommodations for my disability and the letter was given to Mary McCarthy on January 7, 2013. My doctor reminded me that any location where I have to drive over half an hour would not be good either because of my injuries of my C3-C7 disks and back injuries.

I want to work but I need reasonable accommodations due to my disabilities. I was told that Lakewood had no room when I have seen lots of space. I also was told construction was in process in the CHE MED building. I was working in the WIC building which is at least 100 or more feet away.

Can you make the ADA accommodations?

(*Id.*)

Sometime thereafter, Petti submitted a note from Dr. Ingato, dated January 8 and January 10, 2013, stating "please excuse [Petti] from work for the remainder of this week due to allergy syndrome of undetermined etiology." (ECF No. 61-7, Ex. AA.)

On January 10, 2013, McCarthy authored a report documenting her various interactions with Petti relating to Petti's issues with the construction at the Toms River Office. The report noted, among other things, that on January 7, 2013: Petti informed McCarthy that she could not

stay in Toms River Office because "her doctor did not want her there based upon her medical problems"; Miragliotta recommended Petti write a letter requesting special accommodations pursuant to the ADA; Petti indicated she was not seeking Workers' Compensation; Petti was told since she was not making a Workers' Compensation claim, she has to use her "benefit time" if she was uncomfortable in the Toms River Office; and McCarthy read Petti Miragliotta's January 7, 2013 letter ensuring her that the Toms River Office was free from construction debris and residue and informing her that she would need to use benefit time for any further absences. (ECF No. 61-7, Ex. DD.)

On January 11, 2013, Petti completed a "Workers Compensation Accident Investigation Report" seeking Workers' Compensation due to "construction debris/insulation fibers emmitence [sic] in the air [and] on surfaces," listing her injury as "whole body itchy and swollen eyes." (ECF No. 61-7, Ex. EE.) The form was submitted to McCarthy on January 14, 2013. (*Id.*)

On January 14, 2013, Dr. David Murphy, Petti's pulmonologist, submitted a letter to Ocean County requesting Petti be relocated due to the alleged "exposure to dust, molds, etc." at the Toms River Office, stating:

> I am writing this letter for my patient, [Petti]. I am evaluating and treating her for a lung condition. This condition is aggravated by exposure to dusts, molds, etc. [Petti] has informed me that she is exposed to materials and dust from construction near the building in which she is currently working. I would like to request that she be relocated to another building so that she will not be exposed to irritants that exacerbate her lung condition. I would like to request that she remain out of work until this relocation can take place.

(ECF No. 61-7, Ex. FF.)

On January 15, 2013, Petti submitted to a physical examination with Dr. Tanisha Taylor, conducted on behalf of Ocean County pursuant to her Workers' Compensation request. (ECF No. 61-7, Ex. GG.) Dr. Taylor's evaluation notes that Petti was "adamant" that she was being

evaluated for "itching over the entire body" and not breathing problems. (*Id.*) Dr. Taylor concluded that the itching was most likely caused by dry skin during the winter months. (*Id.*) Furthermore, Petti refused Pulmonary Function Testing ("PFTs") and pulse oximetry, even though Dr. Murphy previously recommended she avoid the Toms River Office due to pulmonary dysfunction. (*Id.*) Moreover, Petti "refused to sign consent for [Dr. Taylor] to obtain test results and/or speak with her treating physicians [and] reiterated that her PFTs were normal and she [was] not there to be assessed for breathing concerns." (*Id.*)[5]

On January 16, 2013, Regenye sent a letter to Petti indicating that he was "researching [her] concerns" about the Toms River Office and would be in touch upon conclusion. (ECF No. 61-7, Ex. HH.) On the same date, Remington sent a letter to Miragliotta and Regenye confirming that the two buildings at the Toms River Office were "completely independent," the HVAC, electrical, and plumbing of the two buildings are not connected, and that "work carried out inside of the building does not affect any other area of the . . . complex." (ECF No. 61-7, Ex. II.) On January 17, 2013, Ocean County hired Pro-Lab to conduct a mold analysis in several separate rooms in Ocean County's Toms River building. (ECF No. 61-7, Ex. JJ.) Pro-Lab's report analyzed Room 38, where Petti worked, and found no evidence of elevated mold levels. (*Id.*)

On January 16, 2013, Petti submitted an FMLA request to Ocean County citing "Personal Illness" as the qualifying event. (ECF No. 61-7, Ex. KK.) Petti backdated her request to January 2, 2013 and did not specify an anticipated return date, instead writing "ongoing." (*Id.*) Petti's FMLA claim included a medical certificate certified by Dr. Murphy. (*Id.*) Dr. Murphy diagnosed Petti with "shortness of breath after exposure to construction dust" and listed "small airway

---

[5] Dr. Taylor was also provided with, and reviewed, the relevant asbestos and mold reports and noted the conclusion that there was no asbestos and no visible mold at the Toms River Office. (ECF No. 61-7, Ex. GG.)

obstruction" and "scarring on chest x-ray" as clinical data supporting the diagnosis. (*Id.*) On February 7, 2013, Petti's FMLA request was approved for a period not to exceed twelve weeks, beginning on January 16, 2013. (ECF No. 61-7, Ex. NN.)

On February 13, 2013, while Petti was on FMLA leave, inspectors from New Jersey's Public Employees Occupational Safety and Health ("PEOSH") Program of the New Jersey Department of Health's Division of Epidemiology conducted an unannounced investigation and inspection of Ocean County's Finance Department, which included interviews with employees of the department without supervisors present. (ECF No. 61-5, Ex. I at 2.)[6] The inspection included air quality tests in Room 38, where Petti worked. (*Id.*) On February 22, 2013, Michael Coyne, the Enforcement Coordinator for the PEOSH Program, sent a letter to Regenye indicating that violations of the PEOSH health standards were not observed and that therefore, the case will be closed. (ECF No. 61-8, Ex. SS.)

On April 3, 2013, Petti called McCarthy to inquire as to when her FMLA leave ended. (ECF No. 61-8, Ex. TT.) McCarthy informed her that her FMLA leave ended on April 9, 2013, and that if she wished to extend her FMLA leave, she would have to complete another FMLA request form. (*Id.*) The relevant form was subsequently faxed to Petti. (*Id.*) On April 9, 2013, Petti submitted a second FMLA leave request, indicating she has a disability and stating she "needs to stay away from construction dust." (ECF No. 61-8, Ex. UU.) The request includes an absence start date of April 9, 2013 and no end date. (*Id.*)

On April 12, 2013, Miragliotta sent Petti an e-mail rejecting her second FMLA request due to deficiencies in the request, among other reasons, stating:

> I am in receipt of a request for leave of absence dated April 9,

---

[6] The unannounced inspection was prompted by a complaint Petti filed to PEOSH on January 2, 2013. (ECF No. 61-7, Ex. OO.)

2013. The form is filled out for medical reasons and has a commencement date of April 9, 2013 but does not contain an end date or complete medical certification.

The medical provider form is deficient. It appears you have not advised your medical provider with the facts. As you know, you [sic] work area has been found not to have credible objective evidence to support your complaints of the air quality due to construction and is, in point of fact, in a separate building.

This conclusion that you failed to supply the facts is substantiated by the surprising answer by a medical provider that your condition will not improve "until patient gets moved to another building."

You have not supplied the information required to process your request.

I bring to your attention N.J.A.C. 4A:2-6.2(c):

"An employee who has not returned to duty for five or more consecutive business days following an approved leave of absence shall be considered to have abandoned his or her position and shall be recorded as a resignation not in good standing."

You are directed to return to work since your Family Medical Leave of Absence is completed. Please supply a copy of this letter to your medical provider.

(ECF No. 61-8, Ex. VV.)

On May 8, 2013, Miragliotta sent Petti an "Interactive Process" letter (the "Interactive Process Letter") detailing the efforts Ocean County took to accommodate Petti – and to ensure satisfactory air quality at the Toms River Office – following Petti's requests for ADA accommodations due to her alleged pulmonary disabilities. (ECF No. 61-6, Ex. U.) The Interactive Process Letter stated, in pertinent part:

The alleged locus of the "construction dust" which you complained of was an area which included your work station in the Finance Department situated within at the Toms River headquarters of the Department (herein after Department) at 175 Sunset Avenue[,] Toms River, New Jersey.

As part of the interactive process and to address your allegations the following is noted:

1. Prior to the start of construction, the headquarters buildings at 175 Sunset Avenue, Toms River, New Jersey to be renovated were tested for the presence of asbestos, and sampling was negative for those two buildings.

2. At the start of construction, the Department directed the contractor to seal off the building undergoing renovations in Phase I during construction and gave explicit instructions to the contractor and all sub-contractors that they were not to enter or exit through the employee work areas. The policy was adhered to scrupulously, which included the maintenance of separate restroom facilities outside as well. This was done to prevent debris and dust contamination in any areas employees occupy or visit.

3. The Department retained the engineering firm, [Remington], as Construction and Project Manager. The [Remington] Project Manager is on site daily and maintained daily activity logs detailing all appropriate compliances.

4. The Department also employs a Safety Inspector, who is on-site daily and has reviewed the construction site for compliance with all safety standards. He is certified in OSHA awareness and regulations.

5. The Department retains the nationally known for safety & risk consultant, J.A. Montgomery Risk Control. The Department requested an onsite inspection to determine any recognizable hazards that might affect employee safety or health in the area. On December 11, 2012, [] J.A. Montgomery's Senior Loss Control Consultant[] closely inspected the employee work areas including that of the Finance Department where you worked, and determined the area work site was dust free and debris free.

6. As the result of your January 2013 allegations, the Department Safety Inspector took the additional precautionary measures to insure the employee work area in the Finance Department was protected from the possibility of infiltration by construction dust and/or debris by sealing the windows with "Gorilla" tape and he further secured the exit.

7. Department staff were surveyed individually and asked if working in the office area and its environment, which also included the Finance Department, caused any discomfort or

breathing difficulties. All employees responded in the negative, including an employee who disclosed having an extreme sensitivity to dust and debris.

8. A review provided by [Remington] revealed that the work done during the time period referred to in your complaint cannot be related to renovation issues, as the work was done in a separate building from the employee work area that did not share an HVAC system and no insulation was being completed.

9. On January 15, 2013, Dr. Tanisha Taylor conducted Workers' Compensation physical examinations of you on behalf of [Ocean County]. Dr. Taylor documented that you refused "to take a Pulmonary Function Test (PFTs) and pulse oximetry even though Dr. Murphy (Pulmonologist) put her out of work" and that "she notably refused to sign consent for me to obtain test results and/or speak with her treating physicians." Notably Dr. Taylor reported that you denied any "current breathing problems and rashes."

10. On February 13, 2013 [PEOSHA] conducted a health inspection at 175 Sunset Avenue [] which included your work area in the Finance Department. On February 22, 2013 PEOSHA reported that there were no violations of PEOSHA health standards observed during the inspection.

As part of the interactive process, [Ocean County] will undertake the following efforts:

A) Your physician, Dr. David Murphy, will be provided with a copy of this letter which details efforts undertaken by the Department to reasonably accommodate your ability to discharge your official duties within the Finance Department. He will also be provided with copies [of] the reports referred to and discussed above, as well as[] the [PEOSHA] letter[.]

**B) Additionally throughout the interactive process with you, it was unclear if you ever made your physicians aware of the fact that there was no construction taking place in your building, but was and is, in point of fact, occurring in a completely separate, adjacent building.**

C) Your work location has been moved away from the windows located within the work area of the Finance Department.

D) Furthermore, out of an abundance of caution, the Board will install an air scrubber . . . in the Finance Department and also

provide you with a particulate dust mask or respirator.

Thus, there are no known impediments present with respect to the resumption of your official duties as a Senior Accountant in the Finance Department . . . Therefore, you are directed to report to duty within 5 days of receipt of this letter.

(*Id.*)

Despite receiving the Interactive Process Letter instructing her to return to work within five days, Petti never returned to work after January 7, 2013. (ECF No. 61-2 ¶ 63; ECF No. 76 ¶ 63.) On May 14, 2013, Jessica Strugibenetti, Esq. ("Strugibenetti") sent a letter to Miragliotta informing her that she was representing Petti and requesting information as to the particulate dust mask with which Ocean County had offered to provide Petti in the Interactive Process Letter. (ECF No. 61-8, Ex. XX.)[7] On May 29, 2013, Dr. Murphy sent a letter to Ocean County informing them that a respirator would not be effective as it "cannot be worn for extended periods with discomfort" and indicating that Petti has a latex allergy and neck injury that "prohibit[s] extended use of the respirator." (*Id.*) Dr. Murphy concluded that the best accommodation for Petti would be to "move her into another building where no construction issues are present." (*Id.*)

On May 21, 2013, John Mercun ("Mercun"), Ocean County's legal counsel, sent a letter to Strugibenetti enclosing Remington's report and requesting that Petti authorize Dr. Taylor to review her full medical records. (ECF No. 61-8, Ex. ZZ.) On May 30, 2013, Mercun sent Strugibenetti a second letter informing her that it is Ocean County's "position that since there is no construction in the Finance Department housed [at the Toms River Office], Dr. Murphy's concern about construction issues are resolved as proven through testing." (ECF No. 61-8, Ex. AAA.) Mercun's May 30, 2013 letter further requested that the parties meet to discuss the matter

---

[7] No response to Strugibenetti's May 14, 2013 letter is provided in the record.

and reiterated Ocean County's request that Petti authorize Dr. Taylor to review her full medical records and speak with Dr. Murphy. (*Id.*) Petti rejected Ocean County's offer to meet to discuss the matter. (ECF No. 61-8, Ex. BBB.)[8]

On July 29, 2013, Remington wrote a letter to Miragliotta indicating that it had reviewed all records associated with activities that might have produced silica dust, at Ocean County's request. (ECF No. 61-7, Ex. CC.) Remington noted there "was one instance where . . . demolition debris in a loader fell to the ground and some dust was created" but that it was a "typical construction incident that in no way or form caused major impacts in the surrounding area." (*Id.*)

On July 3, 2013, Ocean County brought a formal disciplinary action against Petti, via a Preliminary Notice of Disciplinary Action, for insubordination, excessive absenteeism, and resignation not in good standing. (ECF No. 61-4, Ex. C.) The notice stated that "Petti has been on unauthorized leave since April 9, 2013" and that on May 8, 2013, Petti "was directed to report to work within 5 days" but failed to do so. (*Id.*) Ocean County set Petti's hearing date for July 23, 2013. (*Id.*)

At the July 23, 2013 hearing, the hearing officer, Bonnie R. Peterson ("Peterson"), heard testimony from Miragliotta and Petti and considered evidence submitted by both parties. (ECF No. 61-8, Ex. EEE.) On August 21, 2013, Peterson issued a decision determining Ocean County was warranted in terminating Petti for insubordination, excessive absenteeism, and resignation not in good standing pursuant to N.J.A.C. 4A:2-2.3(a)(2)-(4) and N.J.A.C. 4A:2-6.2(b)-(c). (*Id.* at 12.) Notably, Peterson found Petti's testimony "troubling" in that she "answered in vague

---

[8] On June 10, 2013, following Petti's rejection of Ocean County's offers, Strugibenetti sent a letter to Petti confirming that Petti requested to "cease all negotiations" with Ocean County and informing Petti that Ocean County has "indicated that it will take disciplinary action against you." (ECF No. 68-1, Ex. CCC.)

ways," "was not deliberate or straight forward in her answers," and "provided not one item of evidence to back up her irrational belief" that silica dust and/or other environmental hazards were penetrating into her workspace despite the experts' conclusions to the contrary. (*Id.* at 11.) Peterson concluded Petti's "demeanor and answers lacked candor" and stated she found "[Petti's] testimony was so lacking in credibility that it was practically useless in determining the facts of [the] matter." (*Id.*)

On September 25, 2013, Petti appealed Peterson's decision to the New Jersey Office of Administrative Law ("OAL"), where the matter was heard by ALJ Robert Bingham II, *In re Petti*, 2015 WL 4186008, No. 13806-13 (Apr. 9, 2015). (ECF No. 61-8, Ex. GGG at 70.) In his April 9, 2015 decision,[9] ALJ Bingham found, *inter alia*, that Ocean County "made efforts to reasonably accommodate [Petti], notwithstanding the safety of her work environment and absence of a work-related illness." (*Id.* at 78.) Ultimately, ALJ Bingham held:

> Under all the facts and circumstances, I **CONCLUDE** that [Ocean County] reasonably exercised its discretion to deny an additional medical leave to [Petti]. I further **CONCLUDE** that charges of excessive absenteeism and resignation not in good standing are justified, and they should be and are hereby sustained. I further **CONCLUDE**, however, that the charge of insubordination should not be sustained because [Petti] did obtain and rely upon the opinion of her physician, however unsupported, rather than blatantly disregard [Ocean County]'s directive to return to duty.
>
> . . .
>
> Therefore, I **CONCLUDE** that, rather than removal, a sixty-day suspension, for excessive absenteeism, and a resignation in good standing is the appropriate sanction in this matter.

(*Id.* at 81-82.)

On May 22, 2014, Petti filed a Charge of Discrimination with the EEOC, EEOC Charge

---

[9] The Civil Service Commission upheld the OAL's decision on May 6, 2015. (ECF No. 61-8, Ex. HHH.)

No. 530-2014-00256, alleging violations of the ADA for failure to provide reasonable accommodations. (ECF No. 61-8, Ex. III.) On July 17, 2014, Ocean County filed a reply to Petti's Charge of Discrimination, citing and explaining the efforts Ocean County undertook to engage Petti in the interactive process. (ECF No. 61-5, Ex. I.) Thereafter, Petti was issued a Right to Sue letter, allowing her to file the Complaint before this Court.

### III. LEGAL STANDARD

Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). A factual dispute is genuine only if there is "a sufficient evidentiary basis on which a reasonable jury could find for the non-moving party," and it is material only if it has the ability to "affect the outcome of the suit under governing law." *Kaucher v. Cty. of Bucks*, 455 F.3d 418, 423 (3d Cir. 2006); *see also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). Disputes over irrelevant or unnecessary facts will not preclude a grant of summary judgment. *Anderson*, 477 U.S. at 248. "In considering a motion for summary judgment, a district court may not make credibility determinations or engage in any weighing of the evidence; instead, the non-moving party's evidence 'is to be believed and all justifiable inferences are to be drawn in his favor.'" *Marino v. Indus. Crating Co.*, 358 F.3d 241, 247 (3d Cir. 2004) (quoting *Anderson*, 477 U.S. at 255)); *see also Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587, (1986); *Curley v. Klem*, 298 F.3d 271, 276-77 (3d Cir. 2002). "Summary judgment may not be granted . . . if there is a disagreement over what inferences can be reasonably drawn from the facts even if the facts are undisputed." *Nathanson v. Med. Coll. of Pa.*, 926 F.2d 1368, 1380 (3rd Cir. 1991) (citing *Gans v. Mundy*, 762 F.2d 338, 340 (3d Cir.),

*cert. denied*, 474 U.S. 1010 (1985)); *Ideal Dairy Farms, Inc. v. John Labatt, Ltd.*, 90 F.3d 737, 744 (3d Cir. 1996).

The party moving for summary judgment has the initial burden of showing the basis for its motion. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). If the moving party bears the burden of persuasion at trial, summary judgment is appropriate only if the evidence is not susceptible to different interpretations or inferences by the trier of fact. *Hunt v. Cromartie*, 526 U.S. 541, 553 (1999). On the other hand, if the burden of persuasion at trial would be on the nonmoving party, the party moving for summary judgment may satisfy Rule 56's burden of production by either (1) "submit[ting] affirmative evidence that negates an essential element of the nonmoving party's claim" or (2) demonstrating "that the nonmoving party's evidence is insufficient to establish an essential element of the nonmoving party's claim." *Celotex*, 477 U.S. at 330 (Brennan, J., dissenting). Once the movant adequately supports its motion pursuant to Rule 56(c), the burden shifts to the nonmoving party to "go beyond the pleadings and by her own affidavits, or by the depositions, answers to interrogatories, and admissions on file, designate specific facts showing that there is a genuine issue for trial." *Id.* at 324; *see also Matsushita*, 475 U.S. at 586; *Ridgewood Bd. of Ed. v. Stokley*, 172 F.3d 238, 252 (3d Cir. 1999). In deciding the merits of a party's motion for summary judgment, the court's role is not to evaluate the evidence and decide the truth of the matter, but to determine whether there is a genuine issue for trial. *Anderson*, 477 U.S. at 249. Credibility determinations are the province of the factfinder. *Big Apple BMW, Inc. v. BMW of N. Am., Inc.*, 974 F.2d 1358, 1363 (3d Cir. 1992).

There can be "no genuine issue as to any material fact," however, if a party fails "to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex*, 477 U.S. at 322-23. "[A]

complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial." *Id.* at 323; *Katz v. Aetna Cas. & Sur. Co.*, 972 F.2d 53, 55 (3d Cir. 1992).

## IV. DECISION

### i. Ocean County's Motion for Summary Judgment

Ocean County moves for summary judgment as to each of Petti's three causes of action: violations of the ADA (Count One), violations of Title VII of the Civil Rights Act (Count Two), and wrongful termination (Count Three). (ECF No. 3.) This Court analyzes each cause of action in turn.

### a. ADA Claim (Count One)

The ADA prohibits employers from discriminating "against a qualified individual with a disability because of the disability of such individual in regard to job application procedures, the hiring, advancement, or discharge of employees, employee compensation, job training, and other terms, conditions, and privileges of employment." 42 U.S.C. § 12111(a). A "qualified individual with a disability" is defined as a person "with a disability who, with or without reasonable accommodation, can perform the essential functions of the employment position that such individual holds or desires." 42 U.S.C. § 12111(8). Discrimination under the ADA includes "not making reasonable accommodations to the known physical or mental limitations of an otherwise qualified individual with a disability." 42 U.S.C. § 12112(b)(5).

The term "disability" means, with respect to an individual, "a physical or mental impairment that substantially limits one of more major life activities," a "record of such impairment," or "being regarded as having such an impairment." 42 U.S.C. § 12102(A)(1)-(3). An individual does not have a disability if the impairment is temporary or does not constitute a

"significant restriction" on the employee's activities. *See Williams v. Philadelphia Hous. Auth. Police Dep't*, 380 F.3d 751, 764 (3d Cir. 2004).

An individual suffers from a "substantial limitation" when he or she is "[u]nable to perform a major life activity that the average person in the general population can perform." 29 C.F.R. § 1630.2(j). A major life activity is one that is "of central importance to daily life," *Toyota Motor Mfg., Ky., Inc. v. Williams*, 534 U.S. 184, 195-96 (2002), such as "caring for oneself, performing manual tasks, walking, seeing, hearing, speaking, breathing, learning, and working." *Kralik v. Durbin*, 130 F.3d 76, 78-79 (3d Cir. 1997) (quoting 29 C.F.R. § 1630.2(i)). However, the "primary object of attention in cases brought under the ADA should be whether covered entities have complied with their obligations and whether discrimination has occurred, not whether an individual's impairment substantially limits a major life activity." 29 C.F.R. § 1630.2(j)(iii).

Here, Petti claims that the presence of construction dust, debris, and asbestos exacerbated her pulmonary condition, thereby causing her to suffer from a substantial limitation against which discrimination is prohibited. (ECF No. 76 at 50.) However, the record is completely devoid of any evidence demonstrating such environmental conditions persisted at the Toms River Office.[10] On the contrary, the November 2012 Remington report found that the building had no asbestos containing material pursuant to the relevant state guidelines (ECF No. 61-6, Ex. N at 16), the December 2012 J.A. Montgomery report concluded that the finance department's workspace was free from construction dust and debris (ECF No. 61-6, Ex. Q), the January 2013 inspection by Pro-Lab turned up no evidence of mold or other air pollutants (ECF No. 61-7, Ex.

---

[10] In her brief, Petti states "[e]vidence that dust, debris existed such as engineer and laboratory reports stating the same existed at the construction area." (ECF No. 76 at 50.) Petti does not cite these reports, nor is there any indication that such reports exist.

JJ), and the February 2013 surprise inspection by PEOSH, an independent state agency, found no violations upon conducting its air quality tests. (ECF No. 61-8, Ex. SS).

Moreover, Petti cannot demonstrate that she suffered from a disability pursuant to the ADA. Petti submitted doctors' notes, however, such notes relied on Petti's unsubstantiated conclusion that the air in her workspace was polluted by construction debris and dust. For instance, Dr. Murphy's note to Ocean County – requesting Petti be relocated – indicated that her "condition is aggravated by exposure to dusts, molds, etc." and that Petti "informed [him] that she is exposed to materials and dust from construction near the building in which she is currently working." (ECF No. 61-7, Ex. FF.) This Court's conclusion is belied by the fact that Petti refused to undergo a PFT with Dr. Taylor and refused to sign a consent allowing Dr. Taylor to obtain test results or speak with her treating physicians. (ECF No. 61-7, Ex. GG.) As the OAL properly noted, there is ample evidence in the record demonstrating the safety of Petti's work environment and the absence of any work-related injury. *See In re Petti*, 2015 WL 4186008, at *12.

Similarly, the record is also devoid of any evidence demonstrating that Ocean County took any adverse employment action against Petti due to her alleged disability. On the contrary, Ocean County proffered evidence of its legitimate, non-discriminatory grounds for terminating Petti, specifically her excessive absenteeism. (ECF No. 61-2 ¶ 63; ECF No. 76 ¶ 63.) This Court's conclusion is bolstered by the findings of the independent hearing officer and the OAL, both of whom determined that Ocean County was just in the actions it took against Petti. (ECF No. 61-8, Ex. EEE; ECF No. 61-8, GGG.)

Even if Petti did provide evidence demonstrating she was a qualified individual with a disability for the purposes of the ADA, her claim would still fail as a matter of law as Ocean

County undertook numerous efforts to accommodate and engage Petti, which she rejected.[11] For instance, Ocean County promptly investigated Petti's claims by hiring three separate outside companies – Remington, J.A. Montgomery, and Pro-Lab – at its own expense to examine and test the premises. (ECF No. 61-6, Ex. M; ECF No. 61-6, Ex. Q.)[12] Thereafter, Ocean County sought to secure Petti's workspace from potential airborne pollutants, despite the lack of objective evidence of the existence of such, by taping the windows shut, and further attempted to involve Petti in the process by sending her the Interactive Process Letter, which, *inter alia*, offered her a particulate dust mask. (ECF No. 61-6, Ex. U.) Petti rebuffed Ocean County's efforts to accommodate her and never returned to work. (ECF No. 61-2 ¶ 63; ECF No. 76 ¶ 63.) Petti's refusal to engage in meaningful dialogue with Ocean County caused the "breakdown in the process" and constitutes bad faith in "determin[ing] what specific accommodations are necessary," especially given the lack of credible evidence of a disability or airborne pollution. *Taylor*, 184 F.3d at 312 (quoting *Bultemeyer*, 100 F.3d at 1285). Accordingly, Ocean County's Motion for Summary as to Petti's ADA claim is **GRANTED**.

### b. Title VII Retaliation Claim (Count Two)

Title VII prohibits employment discrimination on the basis of race, color, religion, sex, or national origin, *Slagle v. Cty. of Clarion*, 435 F.3d 262, 265 (3d Cir. 2006); *see* 42 U.S.C. § 2000e-2, and also precludes an employer from taking adverse action against an employee as

---

[11] The Third Circuit has held that "'both parties bear responsibility for determining what accommodation is necessary'" and "'neither party should be able to cause a breakdown in the process for the purpose of either avoiding or inflicting liability.'" *Taylor v. Phoenixville Sch. Dist.*, 184 F.3d 296, 312 (3d Cir. 1999) (quoting *Bultemeyer v. Fort Wayne Comm. Schs.*, 100 F.3d 1281, 1285 (7th Cir. 1996)). "'Rather, courts should look for signs of failure to participate in good faith of failure by one of the parties to help the other party determine what specific accommodations are necessary.'" *Id.*

[12] Additionally, in December 2012, Ocean County temporarily relocated Petti to its Lakewood facility while testing was conducted. (ECF No. 61-6, Ex. P.)

retaliation for engaging in some protected activity, stating:

> It shall be an unlawful employment practice for an employer to discriminate against any of his employees . . . because he has opposed any practice made an unlawful employment practice by this subchapter, or because he has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this subchapter.

42 U.S.C. § 2000e-3(a).

To establish a claim for retaliation pursuant to Title VII, a plaintiff must demonstrate: "(1) she engaged in an activity protected by Title VII; (2) the employer took an adverse employment action against her; and (3) there was a causal connection between her participation in the protected activity and the adverse employment action." *Moore v. City of Phila.*, 461 F.3d 331, 340 (3d Cir. 2006), *as amended* (Sept. 13, 2006) (quoting *Nelson v. Upsala Coll.*, 51 F.3d 383, 386 (3d Cir. 1995)).

Here, the basis of Petti's Title VII claim is not abundantly clear, but seems to be premised on her protected activity of filing a complaint with PEOSH.[13] While filing a complaint with PEOSH is indeed a protected activity for which Ocean County is prohibited from retaliating against Petti, the record is completely barren of any indication that Petti's termination was motivated whatsoever by her contact with PEOSH. Indeed, Ocean County provided legitimate, non-retaliatory grounds for terminating Petti, her excessive absenteeism (ECF No. 61-2 ¶ 63; ECF No. 76 ¶ 63), and this conclusion is bolstered by the findings of the independent hearing officer and the OAL, both of whom determined that Ocean County took proper action against Petti. (ECF No. 61-8, Ex. EEE; ECF No. 61-8, GGG.) Furthermore, there is no evidence in the record indicating that Ocean County knew Petti was the employee who filed the complaint with

---

[13] In her brief, Petti states "[c]learly [Ocean County's] unyielding demands to return to the construction area were set in stone because they were retaliating against [Petti] for complaining to PEOSH." (ECF No. 76 at 50.)

PEOSH before terminating her. (ECF No. 61-2 at 15.) Accordingly, Ocean County' Motion for Summary as to Petti's Title VII retaliation claim is **GRANTED**.

### c. Wrongful Termination Claim (Count Three)

"Under New Jersey law, 'an employee has a cause of action for wrongful discharge when the discharge is contrary to a clear mandate of public policy.'" *Lawrence v. Nat'l Westminster Bank New Jersey*, 98 F.3d 61, 73 (3d Cir. 1996) (quoting *Pierce v. Ortho Pharm. Corp.*, 417 A.2d 505, 512 (N.J. 1980)). However, where the source of the public policy on which a plaintiff relies is "coterminous with [the plaintiff's] statutory claims, [the plaintiff] cannot advance a separate common law public policy claim." *Lawrence*, 98 F.3d at 73 (citing *Catalane v. Gilian Instrument Corp.*, 638 A.2d 1341, 1349 (N.J. App. Div.), *certif. denied* 642 A.2d 1006 (N.J. 1994)).

Here, Petti's cause of action against Ocean County sounds in common law wrongful termination, however, her common law claim is based on the same underlying public policy concerns as those vindicated in the ADA and Title VII; namely, prohibiting discrimination and retaliation, respectively.[14] Therefore, Petti's wrongful termination claim is preempted by her ADA and Title VII claims and accordingly, Ocean County's Motion for Summary as to Petti's wrongful termination is **GRANTED.**

### ii. Petti's Motion to Strike Ocean County's Summary Judgment Motion and Motion for Emergency Relief

As this Court has granted Ocean County's Motion for Summary Judgment in its entirety,

---

[14] Although Petti argues in her moving papers that her wrongful termination is statutory rather than common law and is asserted pursuant to the National Labor Relations Act ("NLRA") (ECF No. 76 at 16), her Amended Complaint includes no such statutory allegation. (ECF No. 3). Nevertheless, Petti has failed to state a valid cause of action under the NLRA. Petti asserts a "remedy under section 8(a)(1) of the [NLRA]," (ECF No. 76 at 18), however, that section applies only to an employee's right to engage in collective bargaining and is thus wholly inapplicable to this matter. *See* 29 U.S.C. § 158(a)(1).

Petti's Motion to Strike Ocean County's Summary Judgment Motion and Petti's Motion for Emergency Relief are **DENIED AS MOOT**.

## V.    CONCLUSION

For the reasons set forth above, Ocean County's Motion for Summary Judgment is **GRANTED** and Petti's Motion to Strike Ocean County's Summary Judgment Motion and Motion for Emergency Relief are **DENIED AS MOOT**.


**Date: March 26, 2019**                      */s/ Brian R. Martinotti*_____
                                              **HON. BRIAN R. MARTINOTTI**
                                              **UNITED STATES DISTRICT JUDGE**